Judge Hellerstein ☐ORIGINAL

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

# 10 CIV 1630

THE NORTH FACE APPAREL CORP., a
Delaware Corporation; and PRL USA
HOLDINGS, INC., a Delaware
Corporation,

                    Plaintiffs

        v.

FUJIAN SHARING IMPORT & EXPORT
LTD. CO. d/b/a B2BSharing.com;
DONGPING LIU a/k/a DONG PING LIU;
YUAN CHEN; ANDY HUANG; *et al.*

                    Defendants.

**CIVIL ACTION NO. _____**

**MEMORANDUM OF LAW IN
SUPPORT OF PLAINTIFFS'** *EX PARTE*
**APPLICATION FOR A TEMPORARY
RESTRAINING ORDER, SEIZURE
ORDER, DOMAIN NAME TRANSFER
ORDER, ASSET RESTRAINING
ORDER, EXPEDITED DISCOVERY
ORDER AND ORDER TO SHOW
CAUSE FOR PRELIMINARY
INJUNCTION**

**[FILED UNDER SEAL PURSUANT TO
15 U.S.C. § 1116]**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ iii

PRELIMINARY STATEMENT .................................................................................. 2

FACTUAL BACKGROUND ....................................................................................... 5

   A.  Plaintiffs' Trademarks and Products ........................................................ 5

   B.  Defendants' Illegal Activities ................................................................... 7

ARGUMENT .............................................................................................................. 11

   I.  PLAINTIFFS ARE ENTITLED TO A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ENJOINING DEFENDANTS' ILLEGAL ACTS ........................................................ 11

     A.  Defendants' Sale of Counterfeit Products Irreparably Harms Plaintiffs' Marks, Goodwill and Business ................................... 12

     B.  Plaintiffs Are Likely to Prevail on Their Claims for Counterfeiting .... 12

       1.  Plaintiffs' Marks Are Valid And Protectable ................................ 13

       2.  Consumers Are Likely To Be Confused As To The Source of Defendants' Counterfeit Products ............................................ 13

     C.  Plaintiffs Will Likely Prevail on Their Anticybersquatting Consumer Protection Act Claims ............................................................. 14

       1.  The Plaintiffs' Marks Are Distinctive and Famous ....................... 15

       2.  The Domain Names Are Identical Or Confusingly Similar To Or Dilutive of the Plaintiffs' Marks ............................................. 15

       3.  Defendants Have Bad Faith Intent to Profit from Plaintiffs' Marks ............................................................................................. 16

     D.  There is a Fair Ground for Litigation and the Balance of Hardships Tips Decidedly in Plaintiffs' Favor ........................................ 16

   II.  THIS COURT HAS THE AUTHORITY TO ISSUE AN *EX PARTE* TEMPORARY RESTRAINING ORDER AND SEIZURE ORDER ............. 17

   III.  PLAINTIFFS ARE ENTITLED TO AN ORDER PREVENTING THE FRAUDULENT TRANSFER OF ASSETS ............................................ 19

   IV.  PLAINTIFFS ARE ENTITLED TO EXPEDITED DISCOVERY ............. 21

   V.  SERVICE OF PROCESS BY EMAIL IS WARRANTED IN THIS CASE ................ 23

CONCLUSION ..................................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Advanced Portfolio Technologies, Inc. v. Advanced Portfolio Technologies Ltd.*,
  No. 94 Civ. 5620, 1994 WL 719696 (S.D.N.Y. Dec. 28, 1994) ..............................................21

*Ahava (USA), Inc. v. J.W.G. Ltd.*,
  250 F. Supp. 2d 366 (S.D.N.Y. 2003) ...................................................................................12

*Albert Furst von Thurn und Taxis v. Karl Prince von Thurn und Taxis*,
  No. 04 Civ. 6107, 2006 WL 2289847 (S.D.N.Y. Aug. 8, 2006).............................................14

*Ballistic Prods., Inc. v. Precision Reloading, Inc.*,
  No. Civ. 03-2950, 2003 WL 21754816 (D. Minn. July 28, 2003) ..........................................19

*Banff, Ltd. v Federated Dept. Stores Inc.*,
  841 F.2d 486 (2d Cir. 1988) ....................................................................................................13

*Bank of Credit & Commerce Int'l (Overseas) Ltd. v. Tamraz*,
  No. 97 Civ. 4759 (SHS), 2006 WL 1643202 (S.D.N.Y. June 13, 2006) .................................23

*Boston Prof'l Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc.*,
  510 F.2d 1004 (5th Cir.), cert. denied, 423 U.S. 868 (1975).................................................11

*Corning Glass Works v. Jeanette Glass Co.*,
  308 F. Supp. 1321 (S.D.N.Y.), aff'd, 432 F.2d 784 (2d Cir. 1970) .......................................16

*Dallas Cowboys Cheerleaders v. Pussycat Cinema, Ltd.*,
  604 F.2d 200 (2d Cir. 1979) .............................................................................................11, 12

*Diarama Trading Co. v. J. Walter Thompson U.S.A., Inc.*,
  No. 01 Civ 2950, 2005 WL 2148925 (S.D.N.Y. Sept. 6, 2005)...............................................14

*D.R.I., Inc. v. Dennis*,
  No. 03 Civ 10026, 2004 WL 1237511 (S.D.N.Y. June 3, 2004) .............................................23

*El Greco Leather Prods. Co. v. Shoe World, Inc.*,
  806 F.2d 392 (2d Cir. 1986) ....................................................................................................11

*Export-Import Bank of U.S. v. Pulp & Paper Co.*,
  No. 03 Civ. 8554, 2005 U.S. Dist. Lexis 8902 (S.D.N.Y. May 11, 2005)...............................23

*Gucci Am., Inc. v. Exclusive Imports Int'l.*,
  No. 99 Civ 11490, 2007 WL 840128 (S.D.N.Y. Mar. 17, 2007) .............................................13

*Firma Melodiya v. ZYX Music GmbH*,
  882 F. Supp. 1306 (S.D.N.Y. 1995) ..................................................................................11, 12

*Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.*,
  25 F.3d 119 (2d Cir. 1994) ......................................................................................................11

*Ford Motor Co. v. Lapertosa*,
  126 F. Supp. 2d 463 (E.D. Mich. 2000) ..................................................................................19

*Freedom Calls Found. v. Bukstel,*
   05 CV 5460, 2006 U.S. Dist. LEXIS 19685 (E.D.N.Y. Mar. 3, 2006) .....................................15

*Hasbro, Inc. v. Lanard Toys, Ltd.,*
   858 F.2d 70 (2d Cir. 1988) ........................................................................................................12

*HER, Inc. v. Re/Max First Choice, LLC, ,*
   No. 2:06-CV-492, 2007 WL 4379713 (S.D.Ohio Dec. 12, 2007) ............................................19

*Hills Bros. Coffee, Inc. v. Hills Supermarkets, Inc.,*
   428 F.2d 379 (2d Cir. 1970) ......................................................................................................12

*Home Box Office, Inc. v. Showtime/Movie Channel, Inc.,*
   832 F.2d 1311 (2d Cir. 1987) ....................................................................................................12

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,*
   596 F.2d 70 (2d Cir. 1979) ........................................................................................................11

*Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.,*
   51 F.3d 982 (11th Cir. 1995) ...............................................................................................20, 21

*Lorillard Tobacco Co. v. Jamelis Grocery, Inc.,*
   378 F. Supp. 2d 448 (S.D.N.Y. 2005) .......................................................................................13

*Louis Vuitton Malletier & Oakley, Inc. v. Veit,*
   211 F. Supp. 2d 567 (D. Pa. 2002) ............................................................................................16

*Lucas Nursery v. Grosse,*
   359 F.3d 806 (6th Cir. 2004) .....................................................................................................14

*Mattel, Inc. v. Internet Dimensions, Inc.,*
   55 U.S.P.Q. 2d 1620 (S.D.N.Y. 2000) ......................................................................................15

*Mullane v. Central Hanover Bank & Trust Co.,*
   339 U.S. 306 (1950) ...................................................................................................................23

*Oliva v. Ramirez,*
   No. 07-1569, 2007 WL 2436305 (D.P.R. Aug. 21, 2007) .......................................................19

*Otokoyama Co. Ltd. v. Wine of Japan Import, Inc.,*
   175 F.3d 266 (2d Cir. 1999) ......................................................................................................13

*Paco Rabanne Parfums, S.A. v. Norco Enters.,*
   680 F.2d 891 (2d Cir. 1982) ......................................................................................................12

*Philip Morris USA Inc. v. Veles Ltd.,*
   No. 06 CV 2988, 2007 WL 725412 (S.D.N.Y. Mar. 12, 2007) ................................................23

*Polaroid Corp. v. Polarad Elecs. Corp.,*
   287 F.2d 492 (2d Cir. 1961), cert. denied, 368 U.S. 820 (1961)..............................................13

*Polymer Technology Corp. v. Mimran,*
   975 F.2d 58 (2d Cir. 1992), aff'd, 37 F.3d 74 (2d Cir. 1994) ...................................................11

*Power Test Petroleum Distrib., Inc. v. Calcu Gas, Inc.,*
   754 F.2d 91 (2d Cir. 1985) ........................................................................................................12

*Prime Publishers, Inc .v. Am-Republican, Inc.*,
 160 F. Supp. 2d 266 (D. Conn. 2001) ...................................................................15

*Reebok Int'l Ltd. v. Marnatech Enters., Inc.*,
 737 F. Supp. 1521 (S.D. Cal. 1989), aff'd, 970 F.2d 552 (9th Cir. 1992) ...........20, 21

*Republic of Philippines v. Marcos*,
 862 F.2d 1355 (9th Cir. 1988), cert. denied, 490 U.S. 1035 (1989)........................20

*Ryan v. Brunswick Corp.*,
 No. 02-CV-0133E, 2002 WL 1628933 (W.D.N.Y. May 31, 2002)...........................23

*Station Casinos, Inc. v. Domain Magic, LLC*,
 No. 2:06-CV-01610, 2006 WL 3838221 (D. Nev., Dec. 20, 2006)..........................19

*Swatch, S.A. v. SIU Wong Wholesale,*,
 No. 92 Civ 3653, 1992 WL 142745 (S.D.N.Y. June 8, 1992) .................................12

*Tishman v. The Associated Press*,
 No. 05 Civ 4278, 2006 WL 288369 (S.D.N.Y. Feb. 6, 2006)..................................23

*Trans Union v. Credit Research, Inc.*,
 142 F. Supp. 2d 1029 (N.D. Ill. 2001).................................................................24

*Warner Bros., Inc. v. Gay Toys, Inc .*,
 658 F.2d 76 (2d Cir. 1981) ................................................................................11

*Wesley-Jessen Div. of Schering Corp. v. Bausch & Lomb, Inc.*,
 698 F.2d 862 (7th Cir. 1983) ............................................................................11

**Federal Statutes**

15 U.S.C. § 1057(b)...........................................................................................13

15 U.S.C. § 1116 ..................................................................................14, 17, 18

15 U.S.C. § 1117 ...............................................................................................20

15 U.S.C. § 1125(d)...........................................................................................14

15 U.S.C. § 1127 ...............................................................................................14

**Federal Rules**

Fed. R. Civ. P. 30(b)..........................................................................................21

Fed. R. Civ. P. 34(b)..........................................................................................21

**Other Authorities**

Lanham Act, H.R. 4279 § 34(d) ...........................................................................14

Lanham Act, H.R. 4279 § 45.................................................................................14

Senate-House Joint Explanatory Statement on Trademark Counterfeiting Legislation,
 130 Cong. Rec. H12076 (Oct. 10, 1984)..........................................................17

4 C. Wright & A. Miller, *Federal Practice and Procedure* § 1061 (2d ed. 1987)........................23

The North Face Apparel Corp. ("The North Face") and PRL USA Holdings, Inc. ("Polo Ralph Lauren") (The North Face and Polo Ralph Lauren, collectively, are "Plaintiffs") submit this Memorandum of Law in support of their *ex parte* Application for a Temporary Restraining Order, Seizure Order, Domain Name Transfer Order, Asset Restraining Order, Expedited Discovery Order, and Order to Show Cause for Preliminary Injunction as against Fujian Sharing Import & Export Ltd. Co. d/b/a B2BSharing.com; Dongping Liu a/k/a Dong Ping Liu; Yuan Chen; Andy Huang; *et al.* (collectively, "Defendants") based on an action for trademark counterfeiting and cybersquatting arising under the Trademark Act of 1946, 15 U.S.C. §§ 1051 *et seq.*, as amended by the Trademark Counterfeiting Act of 1984, Public Law 98-473 (October 12, 1984), the Anti-Counterfeiting Consumer Protection Act of 1996, Pub. L. 104-153 (July 2, 1996), and the Prioritizing Resources and Organization for Intellectual Property Act of 2007, H.R. 4279 (October 13, 2008) (the "Lanham Act").

## PRELIMINARY STATEMENT

Trademark counterfeiting is an illegal, multi-billion dollar business that harms both consumers, who are deceived into believing they are buying genuine branded goods when they are actually buying often-dangerous counterfeits of questionable quality, and also brand owners, who lose income, but more importantly, risk losing the goodwill and reputation symbolized by their trademarks. The Internet, which has enabled businesses of all kinds -- including counterfeiters -- to reach across national borders to compete in a worldwide market, has also made it easy for counterfeiters, long accustomed to ignoring national and international law governing product safety, sales, taxes, and other "legalities," to hide their true identities and locations. It also allows counterfeiters to avoid almost all civil and criminal liability for their activities.

Plaintiffs have recently learned of a massive Internet counterfeiting ring, run by Defendants, of a size and scale they have not seen before. Specifically, Defendants -- acting in concert with one another -- are manufacturing goods in China utilizing anywhere from 3,150 - 6,500 different domain names to operate a vast network of websites for the sole purpose of offering for sale, selling and importing counterfeit products into the United States and specifically into this Judicial District.

Defendants, who have been in business since at least as early as January 2008, claim that their English-language websites (which accept payment in U.S. Dollars) *each* bring in at least $200

in profits every day -- or $6,000 per website, per month.  Multiply this number over Defendants'
thousands of domain names and Defendants easily have a multi-million dollar counterfeiting
business.  Due to the size of Defendants' illegal business, the fluid nature of websites, and
Defendants' elaborate efforts to conceal their identities, Plaintiffs have not been able to identify the
total number of sites from which counterfeits of Plaintiffs' products are sold at any given time, but,
to date, Plaintiffs have uncovered more than 130 such websites ("Defendants' Websites").

As shown in the examples below, Defendants design their websites so that they look like
authorized online retailers selling Plaintiffs' genuine products.  Defendants perpetuate this illusion
by using domain names incorporating Plaintiffs' registered trademarks (*e.g.*, officialnorthface.com,
northfacesaleoutlet.com, polo-shirts.us, and polocart.com), copying Plaintiffs' copyrighted photos
and other images showing genuine products with detailed product descriptions (often cut-and-pasted
directly from Plaintiffs' authorized customers' websites and/or Plaintiffs' own websites), and even
offer "live 24/7" customer service.  Defendants further perpetuate the illusion of legitimacy by
using all the indicia of authenticity and security that consumers have come to associate with, and
expect from, legitimate on-line businesses: the McAfee® Secure and VeriSign® logos of the best-
known web security companies, the Visa® and MasterCard® logos of the most widely-accepted
credit/charge companies, and, of course, the PayPal® logo, indicating membership in the "gold
standard" of e-transactions club.

 

Defendants' business model of multiple websites allows them to maximize profits, while
simultaneously minimizing risk.  Based on their own claims of website revenue, Defendants'

Websites (only including those known to be carrying counterfeits of Plaintiff's Products) are generating $780,000 per month from sales of counterfeit goods into the United States. While Defendants' Websites are directed to U.S. consumers, Defendants operate their counterfeiting ring from China, where they can easily source counterfeit goods with low risk. Defendants then send the counterfeit goods via U.S. mail in small quantities designed to minimize the chance of attracting the attention of U.S. Customs and Border Protection. Defendants mark the packages as "gifts" or "samples" and use fake return addresses to further avoid detection. Defendants register their domain names (using fake names and addresses) with domain name registrars located in China and host the content on their sites using Internet Service Providers incorporated in, for example Belize, using servers located in Luxembourg. Defendants also use a labyrinth of payment processing systems to mask their identities and prevent tracking of their profits from sales of counterfeit goods. For example, Defendants use a multitude of seemingly individual accounts established with PayPal® and Western Union® (which Defendants frequently change to avoid detection), as well as third party processers located in China and Hong Kong to handle major credit card transactions. All of these services mask Defendants' true identities, as well as the true scope of their counterfeiting ring.

Even where a brand owner challenges and manages to force the inactivation of one or more of Defendants' Websites via a Uniform Domain-Name Dispute-Resolution Policy ("UDRP") action or cease-and-desist letter, Defendants lose no inventory, retain all of their profits, and simply move that portion of their business to another website. To borrow from the well-worn analogy of comparing an anti-counterfeiting program to playing a game of "whack-a-mole," combating this modern day Internet-driven counterfeiting ring is akin to playing a game of whack-a-mole-on-steroids.

Defendants' purposeful, intentional, and unlawful conduct has organized counterfeiting on a scale never before detected by Plaintiffs. It is causing, and will continue to cause, irreparable harm to Plaintiffs' reputations and the goodwill symbolized by their trademarks. To freeze Defendants' activities -- or at least effectively chill them -- Plaintiffs respectfully request that this Court issue, *ex parte*: (i) a temporary restraining order and preliminary injunction against Defendants enjoining the manufacture, importation, distribution, offer for sale, and sale of the Counterfeit Products; (ii) an order temporarily transferring Defendants' domain names containing Plaintiffs' trademarks to Plaintiffs, (iii) an order temporarily restricting transfer of Defendants' assets to preserve Plaintiffs' rights to an equitable accounting; (iv) an order for expedited discovery allowing Plaintiffs to access,

inspect, and copy Defendants' records relating to the manufacture, distribution, offer of sale and sale of the Counterfeit Products and Defendants' financial accounts; and (v) an order allowing service by electronic mail.

## FACTUAL BACKGROUND

### A.     Plaintiffs' Trademarks and Products

For the past 43 years, The North Face, its predecessors-in-interest and associated companies have, themselves and through licensees, sold a range of high-quality technical and casual outdoor apparel and equipment (collectively, the "The North Face Products") using The North Face's trademarks, including those shown below:[1]

  

The North Face's trademarks as shown above and listed in the Complaint (collectively, the "THE NORTH FACE Marks") are the subject of numerous valid and subsisting U.S. registrations, many of which have become incontestable.[2]  The North Face also owns common law rights in the THE NORTH FACE Marks and trade names for use in connection with The North Face Products.[3]

The THE NORTH FACE Marks have been widely promoted, both in the United States and throughout the world and are among the world's most famous and widely recognized trademarks.[4] Consumers, potential consumers and other members of the public and outdoor products industry not only associate The North Face Products with exceptional materials, style and workmanship, but also recognize that The North Face Products originate with The North Face.[5]  The North Face maintains

---

[1]   Declaration of Barbara J. Kaplan, dated February 23, 2010 ("Kaplan Decl.") ¶ 6.
[2]   *Id.* ¶ 4.
[3]   *Id.*
[4]   *Id.* ¶ 5-8.
[5]   *Id.* ¶ 7, 9.

its quality control standards for The North Face Products.[6] Genuine The North Face Products are distributed through a network of authorized distributors and retailers.[7]

The THE NORTH FACE Marks are featured in the advertising and promotion of The North Face Products.[8] The North Face has spent many millions of dollars in advertising and promoting The North Face Products.[9] As a result, The North Face Products generate hundreds of millions of dollars in sales each year.[10] By any measure, the THE NORTH FACE Marks have become symbols of excellence in quality and uniquely associated with The North Face.

Polo Ralph Lauren was founded in 1967 by the iconic designer, Ralph Lauren.[11] For the past 43 years Polo Ralph Lauren, its predecessors in interest and associated companies have, themselves and through licensees, sold high-quality apparel, handbags, accessories and other products (collectively, the "Polo Ralph Lauren Products") using the company's trademarks, including those shown below.[12]

 

Polo Ralph Lauren's trademarks as shown above and listed in the Complaint (collectively, the "POLO RALPH LAUREN Marks") are the subject of numerous valid and subsisting U.S. registrations, many of which have become incontestable.[13] Polo Ralph Lauren also owns common law rights in the POLO RALPH LAUREN Marks and trade names for use in connection with Polo Ralph Lauren.[14]

The POLO RALPH LAUREN Marks have been widely promoted, both in the United States and throughout the world and are among the world's most famous and widely recognized trademarks.[15] Consumers, potential consumers, and other members of the public and fashion industry not only associate Polo Ralph Lauren Products with high-quality materials, style and

---

[6]   *Id.* ¶ 9.
[7]   *Id.* ¶ 9.
[8]   *Id.* ¶ 7-8.
[9]   *Id.* ¶ 8.
[10]  *Id.* ¶ 8.
[11]  Declaration of Ellen Brooks, dated February 23, 2010 ("Brooks Decl.") ¶ 6.
[12]  *Id.* ¶ 5.
[13]  *Id.* ¶ 4.
[14]  *Id.*
[15]  *Id.* ¶ 7.

workmanship, but also recognize that Polo Ralph Lauren Products originate exclusively with Polo Ralph Lauren.[16]  Polo Ralph Lauren maintains its quality control standards for Polo Ralph Lauren Products.[17]  Genuine Polo Ralph Lauren Products are inspected and approved by Polo Ralph Lauren prior to sale.[18]

The POLO RALPH LAUREN Marks are featured prominently in the advertising and promotion of Polo Ralph Lauren Products.[19]  Polo Ralph Lauren spends tens of millions of dollars in advertising and promoting Polo Ralph Lauren Products, which bear and are sold in connection with the POLO RALPH LAUREN Marks.[20]  Polo Ralph Lauren Products have generated billions of dollars in sales.[21]  By any measure, the POLO RALPH LAUREN Marks have become worldwide symbols of excellence in quality and uniquely associated with Polo Ralph Lauren (THE NORTH FACE Marks and POLO RALPH LAUREN Marks, collectively, "Plaintiffs' Marks."  The North Face Products and Polo Ralph Lauren Products, collectively, "Plaintiffs' Products").

**B.     Defendants' Illegal Activities**

Plaintiffs recently learned that they are victims of a massive online counterfeiting scheme of a size and scope they have not seen before.[22]  With no authorization from Plaintiffs, Defendants orchestrating this ring from China and elsewhere around the world, are manufacturing, distributing, importing, offering to sell and selling counterfeit versions of Plaintiffs' Products ("Counterfeit Products") to consumers in the United States using a complex and sophisticated online scheme involving thousands of websites.[23]

To perpetuate this scheme while maintaining anonymity, Defendants have amassed a war chest of as many as 6,500 domain names, some containing Plaintiffs' Marks and other brands' trademarks, all or virtually all registered with false and incomplete identification information.[24]  In addition to allowing Defendants to operate in secret, this cache of domain names allows Defendants to easily move from one location to another if a particular website is challenged by a brand owner.[25]

---

[16]  *Id.* ¶ 5, 7, 9.
[17]  *Id.* ¶ 9.
[18]  *Id.* ¶ 9.
[19]  *Id* ¶ 7.
[20]  *Id.* ¶ 8.
[21]  *Id.* ¶ 8.
[22]  *Id.* ¶ 8; Kaplan Decl. ¶ 13.
[23]  Brooks Decl.¶ 12; Kaplan Decl. ¶ 12; Declaration of Tara Steketee, dated February 23, 2010 ("Steketee Decl.") ¶ 6.
[24]  Steketee Decl. ¶ 6; Declaration of Matthew Hewlett, dated February 23, 2010 ("Hewlett Decl.") ¶ 10-11.
[25]  Hewlett Decl. ¶ 11.

To facilitate sales into the United States, Defendants' Websites are designed to appear to unknowing consumers to be legitimate web stores authorized to sell genuine Plaintiffs' Products.[26] They are sophisticated-looking, written in English and accept U.S. dollars.[27] Defendants' Websites provide detailed product descriptions, claim to provide superior customer service and accept payment by major credit card or PayPal®.[28] Many of Defendants' Websites provide "24/7" live customer service in English.[29] Many of the "About Us" pages talk about Polo Ralph Lauren and/or The North Face as if Defendants' Websites were run by Plaintiffs themselves.[30] In addition, by operating many seemingly-unrelated Defendants' Websites at once, potential customers are lead to believe the web stores are competing sites selling similar products in a variety of price ranges from which they can choose.[31] This could not be further from the truth.  Plaintiffs have discovered interrelationships between Defendants' Websites, including using identical layout, language, pictures, arbitrary model identification numbers, ISPs, registrars, other web hosting services, payment provider information, merchant accounts, return addresses on packaging and arbitrary label irregularities.[32]

One hub of Defendants' counterfeiting ring appears to be the web site B2BSharing.com.[33] In addition to operating their own counterfeit websites, through this website Defendants offer an affiliate program that is "one-stop shopping" for everything one would need to begin operations.[34] B2BSharing.com's affiliate services include registering domain names (using phony names and addresses), optimizing search engine results, setting up payment systems, designing websites, offering guidance on selection of goods offered, providing back-end support services for taking customer orders, and, once orders are placed, even providing the Counterfeit Products and "drop-shipping" services to deliver the counterfeit goods directly to consumers.[35] This affiliate program allows Defendants to make greater illicit profits by gaining access to even more customers for the Counterfeit Products they are manufacturing, distributing and selling.

---

[26] *Id.* ¶ 9.
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] *Id.* ¶ 8, Steketee Decl. ¶ 6.
[33] Hewlett Decl. ¶ 20.
[34] *Id.*
[35] *Id.* ¶ 20, 22.

Defendants claim that any given website, with search engine optimization, can generate profits of $200 a day or $6,000 a month.[36]  Defendants post large volumes of messages on many different websites and message boards to improve Defendants' Websites placement in search engine results.[37]  To maximize profits, Defendants have registered as many as 6,000 domain names.[38] Many of those names contain Plaintiffs' Marks, including but by no means limited to the following:

> 4TheNorthFace.com, 91Polo.com, AddNorthFace.com, AuthenticPolo.com,
> CheerPolo.com, ClothesPolo.com, DesignerRalph.com, ILoveTheNorthFace.com,
> NicePoloStore.com, NorthFace.cc, NorthFaceComing.com,
> NorthFaceMountain.com, NorthFaceOutdoor.com, NorthFaceOutletsale.com, North-
> Face-Sale.com, NorthFaceSaleOutlet.com, NorthFaceSalesOutlet.com,
> NorthFaceSaleStore.com, NorthFacesOutlet.com, NorthFaceSupply.com,
> OfficePolo.com, OfficialNorthFace.com, OfficialPolos.org, OnlineNorthFace.com,
> OutdoorNorthFace.com, OutletNorthFace.com, Polo4All.com, Polo4Sale.com,
> PoloCart.com, PoloNSale.com, Polo-Ralph.com, PoloRalphWorld.com,
> PoloShirtCompany.com, Polo-Shirts.us, PoloShirtsSale.com, PoloShirtsShop.com,
> PolosHome.com, PoloStore.us, PoloTShirtsHan.com, RalphLaurenDesigner.com,
> SaleNorthFaces.com, SellPoloShirts.com, TheNorthFaceComing.com,
> TheNorthFaceMoving.com, TheNorthFaceSaleOnline.com,
> TheNorthFaceSaleShop.co.uk, TheNorthFaceSaleShop.com,
> TheNorthFaceSalesOnline.com, TheNorthFaceSaleStore.com,
> TheNorthFaceShow.com, TheNorthFaceSupplier.com, TheNorthFaceTrade.com,
> TheNorthFaceUKStore.com, TNFShopping.com, and ToNorthFace.com

(the "Infringing Domain Names") to use in connection with Defendants' Websites.[39]  A full list of Defendants' Websites currently known to Plaintiffs is attached to the Steketee Decl. as Exhibit A.[40]

Defendants, knowing what they are doing is illegal, are using demonstrably false names and incomplete identification in order to avoid detection.[41]  The Internet Corporation for Assigned Names and Numbers (ICANN), the body that governs domain names, requires all who register domain names to provide accurate registration information, which is compiled in a network of publicly-available databases commonly referred to as "WhoIs."[42]  When registering the domain names for Defendants' Websites, Defendants provid blatantly false contact information to their

---

[36]  *Id.* ¶ 22.
[37]  *Id.* ¶ 20.
[38]  Steketee Decl. ¶ 6.
[39]  Hewlett Decl. ¶ 10.
[40]  Steketee Decl. ¶ 6.
[41]  Hewlett Decl. ¶ 11.
[42]  *Id.*

domain name registrars in order to avoid detection.[43]  Specifically, in most of their registrations, Defendants use only first names, such as 'sharon,' or randomly-typed letters, such as 'sdfasdsdfgsdfg.'[44]  Similarly, Defendants' addresses listed in the WhoIs contact information associated with their websites typically appear to be incomplete, nonsense, randomly-typed letters, or street addresses with no cities or states listed.[45]  All of these fake names and addresses are annexed hereto, along with their corresponding Defendants' Websites, attached to the Steketee Decl. as Exhibit A.[46]

Defendants' Counterfeit Products are not genuine Plaintiffs' Products and have not been manufactured by or for Plaintiffs. Plaintiffs did not inspect, package, or approve the Counterfeit Products for sale or distribution.[47]  Defendants use a Chinese-based drop shipper to send the Counterfeit Products in small quantities through the mail to avoid the attention of U.S. Customs and Border Protection.[48]  The packages lack any discernable return address identifying the name or location of the seller.[49]  Defendants mark their packages containing Counterfeit Products as "gifts" or "samples" to further avoid detection by Customs.[50]

Defendants set up multiple accounts using an intricate web of merchant accounts and payment processors for the purpose of hiding their true identities and to prevent law enforcement and brand owners from tracking Defendants' profits from the sale of Counterfeit Products.[51]  Specifically, Defendants intermingle funds by using a merchant account from one web site to process payments from another site.[52]  For example, purchases made from TheNorthFaceSaleShop.com, OfficialNorthFace.com, and several other of Defendants' Websites process through another website operated by Defendants, www.inthego.com.[53]  Defendants also use multiple individual accounts at Paypal and Western Union[54] so that each account appears to be individually-controlled and independent when in fact they are all controlled by Defendants.[55]  It is

---

[43]  *Id.* 11-12.
[44]  *Id.* 11.
[45]  *Id.*
[46]  Steketee Decl. ¶ 6.
[47]  Hewlett Decl. ¶ 16-17; Brooks Decl.¶ 12; Kaplan Decl. ¶ 12.
[48]  Hewlett Decl. ¶ 16.
[49]  *Id.*
[50]  *Id.*
[51]  *Id.* ¶ 13-15.
[52]  *Id.* ¶ 15.
[53]  *Id.*
[54]  *Id.* ¶ 13.
[55]  *Id.* ¶ 14.

likely Defendants are changing accounts so often and dividing the movement of their monies through multiple accounts to further avoid having any account worth more than $10,000 and ease their transfer of money out of the U.S. without giving disclosures related to money laundering laws.[56]

Finally, Defendants also use less-established, off-shore processors like IPS (International Payment Solutions), ECPSS credit card, and Alyarica Ltd. Credit Card Payment.[57] One of Defendants' payment processors, GSPay, specifically markets its payment processing services to "high risk merchant accounts" for "replica merchants."[58] These third party processors also serve to minimize Defendants' exposure to United States enforcement and to maintain Defendants' anonymity, as these third party processors rather than Defendants' true identity show up on the consumer's credit card statement.[59]

Without the relief requested by Plaintiffs' instant motion, Defendants' illegal activity will continue unabated and Plaintiffs will suffer enormous irreparable harm [60]

## ARGUMENT

## I.  PLAINTIFFS ARE ENTITLED TO A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ENJOINING DEFENDANTS' ILLEGAL ACTS

Once a violation of the Trademark Act of 1946, 15 U.S.C. § 1051, *et seq.*, as amended (the "Lanham Act") is demonstrated, injunctive relief will readily issue.[61] Courts have granted preliminary relief when a party's proprietary rights are threatened by the sale of potentially inferior versions of its products, bearing marks or ornamentation indicating affiliation with the moving party. Courts base this relief on the trademark holder's "inability to control the nature and quality of the infringer's goods . . . not because the infringer's goods are necessarily inferior."[62]

---

[56] *Id.* ¶ 13, 23.
[57] *Id.* ¶ 13.
[58] *Id.*; Declaration of John S. Rainey, dated February 23, 2010 ("Rainey Decl.") ¶ 10.
[59] Hewlett Decl. ¶ 14.; Rainey Decl. ¶ 6.
[60] Kaplan Decl. ¶ 16.
[61] *See, e.g., Dallas Cowboys Cheerleaders v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 205 (2d Cir. 1979); *Boston Prof'l Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc.,* 510 F.2d 1004, 1013 (5th Cir.), *cert. denied,* 423 U.S. 868 (1975); *Warner Bros., Inc. v. Gay Toys, Inc.,* 658 F.2d 76 (2d Cir. 1981).
[62] *Wesley-Jessen Div. of Schering Corp. v. Bausch & Lomb, Inc.,* 698 F.2d 862 (7th Cir. 1983); *accord El Greco Leather Prods. Co. v. Shoe World, Inc.,* 806 F.2d 392 (2d Cir. 1986); *Polymer Technology Corp. v. Mimran,* 975 F.2d 58, 62 (2d Cir. 1992), *amended reported at* 1992 U.S. App. LEXIS 32204 (2d Cir. 1992), *aff'd* 37 F.3d 74 (2d Cir. 1994 ("actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain").

The Second Circuit holds that in order to obtain preliminary injunctive relief, a party must establish: (1) irreparable harm; and (2) either (a) probable success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation with the balance of hardships tipping decidedly in favor of the party requesting preliminary relief.[63] This standard applies where a preliminary injunction is sought for an alleged trademark infringement.[64] As shown below, Plaintiffs meet each of these criteria.

### A.   Defendants' Sale of Counterfeit Products Irreparably Harms Plaintiffs' Marks, Goodwill and Business

The damage to a trademark owner through diminished goodwill, loss of control over reputation or loss of quality control of its products is irreparable, and such irreparable injury is presumed sufficient for the granting of a preliminary injunction.[65] This Court has held that, with respect to trademark infringement claims, "irreparable harm may be presumed upon a showing that [a plaintiff's] trademark is protectable and that a likelihood of confusion exists as to the ownership or source of goods in question"[66] and that "a showing of likelihood of [brand] confusion establishes both a likelihood of success on the merits and irreparable harm."[67]

### B.   Plaintiffs Are Likely to Prevail on Their Claims for Counterfeiting

To prevail on their trademark counterfeiting claims, Plaintiffs must prove, *inter alia*: (1) the THE NORTH FACE Marks and POLO RALPH LAUREN Marks are entitled to protection; and (2) there is a likelihood of confusion between Defendants' Counterfeit Products and genuine The North

---

[63] *Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.*, 25 F.3d 119, 122 (2d Cir. 1994); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979); *Firma Melodiya v. ZYX Music GmbH*, 882 F. Supp. 1306, 1311 (S.D.N.Y. 1995).

[64] *Dallas Cowboys Cheerleaders, Inc.*, 604 F.2d at 206-07.

[65] *Paco Rabanne Parfums, S.A. v. Norco Enterps.*, 680 F.2d 891, 894 (2d Cir. 1982) ("likelihood of damage to reputation and good will...entitles a plaintiff to preliminary relief"); *Hills Bros. Coffee, Inc. v. Hills Supermarkets, Inc.*, 428 F.2d 379, 381 (2d Cir. 1970); *Power Test Petroleum Distributors, Inc. v. Calcu Gas, Inc.*, 754 F.2d 91 (2d Cir. 1985); *Home Box Office, Inc. v. Showtime/Movie Channel, Inc.*, 832 F.2d 1311 (2d Cir. 1987) (a showing of likelihood of confusion as to source or sponsorship establishes the risk of irreparable harm as well as the requisite likelihood of success on the merits).

[66] *Firma Melodiya*, 882 F. Supp. at 1311; *See also, Swatch, S.A. v. SIU Wong Wholesale*, Not Reported in F.Supp., 1992 WL 142745 at *2 (S.D.N.Y. June 8, 1992).

[67] *Ahava (USA), Inc. v. J.W.G. Ltd.*, 250 F. Supp. 2d 366, 369 (S.D.N.Y. 2003); *see also Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70,73 (2d Cir. 1988).

Face Products bearing the THE NORTH FACE Marks and genuine Polo Ralph Lauren Products bearing the POLO RALPH LAUREN Marks.[68]

### 1. Plaintiffs' Marks Are Valid And Protectable

Through their pleadings, each Plaintiff has verified that it is the owner of all right, title and interest in and to its respective marks in connection with the same type of goods and services being counterfeited by Defendants, namely on-line retail store services, apparel, and related accessories, including shirts, pants, jackets, gloves, shoes, and backpacks.[69] Plaintiffs have also demonstrated that their marks are the subject of multiple federal registrations, many of which are incontestable. These registrations are *prima facie* evidence of the validity of Plaintiffs' Marks, as well as each Plaintiff's exclusive right to use its marks in commerce and in connection with the goods or services specified in the registrations.[70] Plaintiffs' evidence is sufficient to create a likelihood that they will prevail in showing Plaintiffs' Marks are protectable.

### 2. Consumers Are Likely To Be Confused As To The Source of Defendants' Counterfeit Products

Courts in this District have found that, "where counterfeit marks are involved, it is not necessary to perform the step-by-step examination of each *Polaroid* factor[71] because counterfeit marks are inherently confusing."[72]

A counterfeit mark is (1) a non-genuine mark that is identical to or substantially indistinguishable from a registered mark that is in use; (2) a mark which is being used for the same goods and services as the accused mark; and (3) a mark of which the accused use at the time of

---

[68] *See, e.g., Otokoyama Co. Ltd. v. Wine of Japan Import, Inc.*, 175 F.3d 266, 270 (2d Cir. 1999); *Banff, Ltd. v Federated Dept. Stores Inc.*, 841 F.2d 486, 489-90 (2d Cir. 1988).

[69] Kaplan Decl. ¶ 4; Brooks Decl. ¶ 4.

[70] *See* 15 U.S.C. § 1057(b).

[71] In the Second Circuit, likelihood of confusion is assessed by following the factors enunciated in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495-96 (2d Cir. 1961), *cert. denied*, 368 U.S. 820 (1961); *see also Banff, Ltd.*, 841 F.2d at 489-90. The eight, non-exhaustive factors used to analyze whether there is likelihood of confusion are: (1) the strength of the Plaintiffs' mark; (2) the degree of similarity between the Plaintiffs' and Defendant's marks; (3) the proximity of the products; (4) the likelihood that the senior user will bridge the gap; (5) the sophistication of the buyers; (6) the quality of the defendant's product; (7) actual confusion; and (8) the defendant's intent in adopting its own mark. *See Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d at 495.

[72] *Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*, 378 F. Supp. 2d 448, 455 (S.D.N.Y. 2005); *see also Gucci America, Inc. v. Exclusive Imports Int'l.*, Not Reported in F. Supp. 2d, 2007 WL 840128 at *4 (S.D.N.Y. Mar. 17, 2007) (vacated on other grounds by *Gucci Am., Inc. v. Exclusive Imports Int'l.*, Not Reported in F. Supp. 2d, 2007 WL 2892668 (S.D.N.Y. Oct. 2, 2007)).

production is not authorized by the owner of the mark.[73]  Plaintiffs have established that: (1) the marks used by Defendants are identical to or substantially indistinguishable from Plaintiffs' federally registered marks, which Plaintiffs are using in commerce;[74] (2) Defendants are offering the same type of goods as those offered by Plaintiffs;[75] (3) Defendants' use is not authorized by Plaintiffs.[76]

As such, Plaintiffs have demonstrated that consumers are likely to be confused as to the source of Defendants' Counterfeit Products.

### C.    Plaintiffs Will Likely Prevail on Their Anticybersquatting Consumer Protection Act Claims

The Anticybersquatting Consumer Protection Act of 1996 (ACPA) is applicable in instances when a domain name registrant has a bad faith intent to profit from a domain name that "is identical or confusingly similar to or dilutive of" the distinctive or famous mark of another.  In such cases, in addition to other damages, "a court may order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark."[77]  Courts have often cited one focus of the ACPA is to address counterfeit sellers who "register well-known marks to prey on consumer confusion by misusing the domain name to divert customers from the mark owner's site to the cybersquatter's own site, and target distinctive marks to defraud consumers."[78]

Defendants have registered and are using at least the following Infringing Domain Names containing the THE NORTH FACE Marks or the POLO RALPH LAUREN Marks:

> 4TheNorthFace.com, 91Polo.com, AddNorthFace.com, AuthenticPolo.com, CheerPolo.com, ClothesPolo.com, DesignerRalph.com, ILoveTheNorthFace.com, NicePoloStore.com, NorthFace.cc, NorthFaceComing.com, NorthFaceMountain.com, NorthFaceOutdoor.com, NorthFaceOutletsale.com, North-Face-Sale.com, NorthFaceSaleOutlet.com, NorthFaceSalesOutlet.com, NorthFaceSaleStore.com, NorthFacesOutlet.com, NorthFaceSupply.com, OfficePolo.com, OfficialNorthFace.com, OfficialPolos.org, OnlineNorthFace.com, OutdoorNorthFace.com, OutletNorthFace.com, Polo4All.com, Polo4Sale.com,

---

[73] *See* Lanham Act §§ 34(d) and 45; 15 U.S.C. §§ 1116(d) and 1127.

[74] *Supra* at p. 7-8.

[75] *Id.*

[76] *Id.*

[77] 15 U.S.C. § 1125(d).

[78] *Lucas Nursery v. Grosse*, 359 F.3d 806, 809 (6th Cir. 2004); see also, *Diarama Trading Co., Inc. v. J. Walter Thompson U.S.A., Inc.*, Not Reported in F. Supp. 2d, 2005 WL 2148925 at *12 (S.D.N.Y. Sept. 6, 2005), September 06, 2005; *Albert Furst von Thurn und Taxis v. Karl Prince von Thurn und Taxis*, Not Reported in F. Supp. 2d, 2006 WL 2289847 at *13 (S.D.N.Y. Aug. 8, 2006).

PoloCart.com, PoloNSale.com, Polo-Ralph.com, PoloRalphWorld.com,
PoloShirtCompany.com, Polo-Shirts.us, PoloShirtsSale.com, PoloShirtsShop.com,
PolosHome.com, PoloStore.us, PoloTShirtsHan.com, RalphLaurenDesigner.com,
SaleNorthFaces.com, SellPoloShirts.com, TheNorthFaceComing.com,
TheNorthFaceMoving.com, TheNorthFaceSaleOnline.com,
TheNorthFaceSaleShop.Co.uk, TheNorthFaceSaleShop.com,
TheNorthFaceSalesOnline.com, TheNorthFaceSaleStore.com,
TheNorthFaceShow.com, TheNorthFaceSupplier.com, TheNorthFaceTrade.com,
TheNorthFaceUKStore.com, TNFShopping.com, and ToNorthFace.com.

## 1.    Plaintiffs' Marks Are Distinctive and Famous

Plaintiffs' well-established the THE NORTH FACE Marks and POLO RALPH LAUREN
Marks are closely linked with each respective Plaintiff's success.[79]  As noted above, Plaintiffs have
invested many millions of dollars in advertising and promoting their respective trademarks in the
United States and throughout the world.  As a result, Plaintiffs' Marks have a high degree of
acquired distinctiveness, and, in turn, Plaintiffs are likely to succeed in showing that their Marks are
distinctive or famous.  Also as discussed above, many of the U.S. registrations for Plaintiffs' Marks
are incontestable, thus entitling Plaintiffs to a presumption of inherent distinctiveness.

## 2.    The Domain Names Are Identical Or Confusingly Similar To Or Dilutive of the Plaintiffs' Marks

The Infringing Domain Names are identical or confusingly similar to the THE NORTH
FACE Marks and/or POLO RALPH LAUREN Marks.  The inclusion of a plaintiff's trademark
combined with usage of the mark on the website has been held to be sufficient for a finding of
confusing similarity for ACPA purposes.[80]  Courts have found that the addition of generic or
geographic terms, such as 'supply,' 'shirts,' 'outdoor,' 'UK,' 'sale,' 'shop,' or 'trade,' are not
sufficient to distinguish the domain name from a protected mark that it contains.[81]  The fact that the
most distinctive aspects of either the THE NORTH FACE Marks (i.e., the words 'North Face') or
the POLO RALPH LAUREN Marks (i.e., the word 'Polo') appear without alteration in all these
domain names, clearly referring to Plaintiffs' brands, is sufficient to show that these Infringing
Domain Names are identical and or confusingly similar to Plaintiffs' Marks.

---

[79] Kaplan Decl. ¶ 5-8; Brooks Decl. ¶ 5-8.
[80] *Mattel, Inc. v. Internet Dimensions, Inc.*, 55 U.S.P.Q. 2d 1620 (S.D.N.Y. 2000).
[81] *See, e.g. Prime Publishers, Inc .v. Am.-Republican, Inc.*, 160 F. Supp. 2d 266, 279-280 (D. Conn. 2001); *Freedom Calls Found. v. Bukstel*, 2006 U.S. Dist. LEXIS 19685, 40-41 (E.D.N.Y. Mar. 3, 2006).

### 3.     Defendants Have Bad Faith Intent to Profit from Plaintiffs' Marks

Courts have held that the registration of a trademark owner's mark as part of a domain name used to sell counterfeit versions of the trademark owner's goods is a particularly egregious form of bad faith.[82]   Bad faith could hardly be more clear than in a case like this, where Defendants are using Plaintiffs' famous trademarks in domain names used for counterfeit-selling websites masquerading as authentic sources of Plaintiffs' Products.  The Court should not hesitate to find Plaintiffs likely to succeed under their ACPA claims.

### D.     There is a Fair Ground for Litigation and the Balance of Hardships Tips Decidedly in Plaintiffs' Favor

Plaintiffs strongly believe they have established the required likelihood of success as to Defendants' liability for trademark counterfeiting and cybersquatting under the Lanham Act. However, should this Court not find such likelihood of success on the merits, Plaintiffs respectfully submit that they have at least raised serious questions going to the merits of their claims, and that the balance of hardships tips decidedly in Plaintiffs' favor.

For the same reasons that Plaintiffs are likely to prevail on their claims, Plaintiffs have raised serious questions for which there is a fair ground for litigation.  This Court must then balance Plaintiffs' harm from the wrongful denial of a temporary restraining order and preliminary injunction against any harm Defendants may suffer from granting an injunction that would not be cured by prevailing on the merits and recovering on Plaintiffs' injunction bond.  As set forth above, the harm to Plaintiffs is irreparable.  The continued unauthorized use of Plaintiffs' Marks further threatens Plaintiffs' reputation because Plaintiffs will lose control over the quality and appearance of their products, which destroys the value of the THE NORTH FACE Marks and POLO RALPH LAUREN Marks as a designation of source.  The potential harm to Defendants, on the other hand, is purely monetary.  Defendants have no legitimate interest in selling their Counterfeit Products or otherwise using Plaintiffs' Marks without Plaintiffs' permission.  Moreover, given "the probable outcome of this action, this is a loss which [Defendants] may justifiably be called upon to bear."[83]

---

[82] *See, e.g. Louis Vuitton Malletier & Oakley, Inc. v. Veit*, 211 F. Supp. 2d 567, 584-585 (D. Pa. 2002).
[83] *Corning Glass Works v. Jeanette Glass Co.*, 308 F. Supp. 1321, 1328 (S.D.N.Y.), *aff'd*, 432 F.2d 784 (2d Cir. 1970).

## II.   THIS COURT HAS THE AUTHORITY TO ISSUE AN *EX PARTE* ORDER

Plaintiffs request this relief *ex parte* not only because experience in other cases has shown that, if given notice, defendants will simply cancel accounts, dispose of or hide their business records related to the counterfeit products, and move the situs of their counterfeit operations, but also because, without *ex parte* relief, Plaintiffs will not be able to discover the true identities of these counterfeiters, possible sources for the Counterfeit Products, and render meaningless Plaintiffs' equitable right to an accounting of profits from Defendants' sale of the Counterfeit Products.

The need for *ex parte* relief is even greater in today's global economy where counterfeiters have all the advantages of anonymity provided by the Internet.  Experience in other cases has shown that, without the requested relief, neither this Court nor Plaintiffs will be able to prevent the disappearance or destruction of crucial evidence that would enable Plaintiffs to track the sources of these Counterfeit Products.[84]  Plaintiffs are currently unaware of the true identities and locations of the Defendants or the location of Defendants' other websites and Counterfeit Products that are being readied for distribution.  It is vital that Plaintiffs immediately obtain information concerning Defendants' sources, distribution network, and flow of profits to minimize future irreparable harm. This Court's authority to issue the *ex parte* restraining and seizure order requested is specifically mandated by § 34 of the Lanham Act.[85]  Congress's purpose in providing for *ex parte* remedies was to ensure that courts were able to effectively exercise their jurisdiction in counterfeiting cases and to prevent counterfeiters served with a civil summons from disappearing or quickly disposing of existing inventory of counterfeit items and the records relating to their manufacture and distribution.[86]

Once a violation of the Lanham Act is demonstrated, the issuance of an *ex parte* order is appropriate upon a showing that: (i) the person obtaining the order will provide adequate security; (ii) an order other than an *ex parte* order is not adequate to achieve the purposes of 15 U.S.C. § 1114; (iii) the applicant has not publicized the requested seizure; (iv) the applicant is likely to succeed in showing the defendant is using counterfeit marks; (v) an immediate and irreparable

---

[84]   Kaplan Decl. ¶ 15-16.
[85]   15 U.S.C. § 1116.
[86]   Senate-House Joint Explanatory Statement on Trademark Counterfeiting Legislation, 130 Cong. Rec. H12076, at 12080 (Oct. 10, 1984).

injury will occur if such seizure is not ordered; (vi) the materials to be seized will be located at the place identified in the application; (vii) the harm to the applicant in denying the application outweighs the harm to the legitimate interests of the person against whom seizure would be ordered; and (viii) if the applicant were to proceed on notice to the defendant, the defendant or persons acting in concert with defendant would destroy, move, hide, or otherwise make such matter inaccessible to the court. *See* 15 U.S.C. § 1116(d)(4)(B).

A preliminary injunction is insufficient in cases, such as the instant one, involving a ring of offshore counterfeiters who have hidden their true identities. Without the remedy of an *ex parte* temporary restraining order and seizure, this lawsuit will be an exercise in futility. Courts comprehending the unfortunate reality of this situation, the covert nature of counterfeiting activities, and the vital need to establish an economic disincentive for trademark counterfeiting, now regularly issue *ex parte* orders.[87]

Plaintiffs meet each of the criteria for issuance of a temporary restraining order and seizure order required by the Lanham Act.[88] Plaintiffs have not publicized the requested seizure.[89] Plaintiffs have submitted evidence to show Defendants' offer for sale and sale of Counterfeit Products. Plaintiffs have established that Defendants have gone to great lengths to conceal their identities. If given notice, Defendants can easily move or destroy all records of their identity and hide all evidence of their dealings in Counterfeit Products. If this occurs, Plaintiffs will suffer irreparable injury in that they will be denied access to the evidence to establish the identities of the counterfeiters and the accounting of profits to which Plaintiffs are entitled. In addition, if Defendants are given notice, there is a strong likelihood that they will destroy all evidence that may assist Plaintiffs in determining the source of the Counterfeit Products, and in stopping the continuing manufacture and flow of these Counterfeit Products.

---

[87] *See, e.g., Antik Denim LLC v. Da Urban Hut et al.*, 05 CV 10077 (JFK) (S.D.N.Y. Dec. 12, 2005); *The North Face Apparel Corp. v. TC Fashions, Inc.*, 05 CV 9082 (S.D.N.Y. Oct. 25, 2005); *The North Face Apparel Corp. v. Reliance Dep't Store, Inc.*, 03 CV 9596 (BSJ) (S.D.N.Y. Dec. 3, 2003); *Cartier Int'l B.V. v. Sam Liu*, 02 CV 7926, 2003 WL 1900852 (S.D.N.Y. Apr. 17, 2003); *Fila U.S.A., Inc. v. Top Luxor Trading*, CV 98-5187 (C.D. Cal. June 29, 1998); *Reebok Int'l Ltd. v. McLaughlin*, 89 Civ. 1739-T (S.D. Cal. Nov. 27, 1989); *Reebok Int'l Ltd. v. Marnatech Enters., Inc.*, 737 F. Supp. 1521 (S.D. Cal. 1990); *Fila U.S.A., Inc. v. Eidai Int'l*, CV 93-00837 (D. Haw. Oct. 29, 1995); *Reebok Int'l Ltd. v. Fairgulf Int'l Shipping & Trading, U.S.A., Inc.*, 93 Civ. 391 (W.D. Tex. Sept. 28, 1993); *Cartier Int'l v. Gorski*, 301 CV 1948 (PCD) (D. Conn. Oct. 17, 2001).

[88] Plaintiffs have indicated the willingness and ability to provide a bond to the Court in conjunction with the *ex parte* relief that it seeks. *See* Plaintiffs' [Proposed] Order, filed herewith.

[89] Kaplan Decl. ¶ 17; Brooks Decl. ¶ 14; Declaration of Seth E. Kertzer, dated February 24, 2010 ("Kertzer Decl.") ¶ 7.

Along with an order for seizure of Counterfeit Products, means for making Counterfeit Products, and business records, Plaintiffs respectfully request an order of *ex parte* seizure of the Infringing Domain Names from Defendants. Specifically, Plaintiffs request an order transferring the Infringing Domain Names, whether by the domain name registries, namely Verisign, Inc. or Neustar, Inc., or by registrars for particular Infringing Domain Names, to a registrar of Plaintiffs' selection to hold and disable the Infringing Domain Names until further order from this Court. Given Defendants' *modus operandi* of fluidly moving their infringing websites among the thousands of domain names they have registered under phony names, it is crucial that Plaintiffs be able to prevent Defendants from simply moving their operations to new domain names. Other courts have granted such injunctive relief to prevent cybersquatters from continuing to operate.[90]

Given the nature of Defendants' counterfeiting operations, an order other than an *ex parte* order would be inadequate to achieve the purposes of 15 U.S.C. § 1114. The harm to Plaintiffs' Marks, as well as the goodwill in denying the application greatly outweighs the harm to Defendants' interests in continuing to sell Counterfeit Products. If Plaintiffs were to proceed on notice to Defendants, Defendants would likely destroy, move, hide, or otherwise make such evidence inaccessible to the Court. It is thus respectfully submitted that an *ex parte* temporary restraining and seizure order is necessary to protect Plaintiffs' trademark rights and to prevent further harm to Plaintiffs and the consuming public.

## III.   PLAINTIFFS ARE ENTITLED TO AN ORDER PREVENTING THE FRAUDULENT TRANSFER OF ASSETS

In addition, Plaintiffs request an order restraining Defendants' assets so that Plaintiffs' right to an equitable accounting of Defendants' profits from sales of the Counterfeit Products is not impaired. The Second Circuit routinely provides for such relief to ensure the availability of an equitable accounting and issuing the order on an *ex parte* basis will ensure Defendants' compliance with the order. Experience shows that defendants in these types of cases will otherwise ignore orders restraining assets that are issued with prior notice and claim ignorance of their

---

[90] *See, e.g. Ford Motor Co. v. Lapertosa*, 126 F. Supp. 2d 463, 62 U.S.P.Q.2d 1789 (E.D. Mich., 2000); *Trans Union LLC v. Credit Research, Inc,* 142 F. Supp. 2d 1029 (N.D. Ill. 2001); *Ballistic Products, Inc. v. Precision Reloading, Inc.,* Not Reported in F. Supp. 2d, 2003 WL 21754816 (D. Minn. July 28, 2003); *Station Casinos, Inc. v. Domain Magic, LLC,* 2006 WL 3838221 (D. Nev. Dec. 20, 2006); *Oliva v. Ramirez,* 2007 WL 2436305 (D.P.R. Aug. 21, 2007); and *HER, Inc. v. Re/Max First Choice, LLC*, Not Reported in F. Supp. 2d, 2007 WL 4379713 (S.D. Ohio Dec. 12, 2007).

responsibilities while simultaneously draining their financial accounts before an order is issued, thereby rendering a plaintiff's right to an equitable accounting meaningless.[91]  In this case, given the likely plethora of accounts controlled by Defendant, many of which are located outside the United States, and the ease with which Defendants will be able to hide their assets, it is particularly important that the Court order an *ex parte* order freezing of all Defendants' assets from their illicit operations located in the U.S.

Plaintiffs have shown a strong likelihood of succeeding on the merits of their trademark counterfeiting claims, and thus Plaintiffs ultimately will be entitled to an equitable accounting of profits from sales of Defendants' Counterfeit Products. [92]  In this regard, courts of several circuits have noted that a district court has the inherent authority, pursuant to the Lanham Act, to issue an order restraining a defendant's assets so that a plaintiff's right to an equitable accounting is not later rendered meaningless.[93]

In the seminal case of *Reebok v. Marnatech*, the District Court granted the plaintiffs a limited restraint of the defendants' assets for the purpose of preserving same, thus ensuring the availability of a meaningful accounting after trial.[94]  The Ninth Circuit affirmed the District Court's decision stating:

> Because the Lanham Act authorizes the District Court to grant [plaintiffs'] an accounting of [defendants'] profits as a form of final equitable relief, the District Court has the inherent power to freeze [defendants'] assets in order to ensure the availability of that final relief.[95]

In the years since *Marnatech*, virtually all the federal courts have granted the temporary restraint of assets in cases similar to this one.[96]  Because the Lanham Act authorizes the award of an accounting of a counterfeiter's profits, the Court has the inherent power to freeze the counterfeiters' assets to assure the availability of that recovery.  Restraint can be granted pursuant to Federal Rules of Civil Procedure Rules 64 and 65, under §§ 34 and 35 of the  Lanham Act, and under the Court's

---

[91] Kaplan Decl. ¶ 15-16.

[92] 15 U.S.C. § 1117.

[93] *See, e.g., Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982 (11th Cir. 1995); *Reebok Int'l Ltd. v. Marnatech Enters., Inc.*, 737 F. Supp. 1521 (S.D. Cal. 1989), *aff'd* 970 F.2d 552 (9th Cir. 1992).

[94] *Reebok Int'l Ltd. v. Marnatech Enter.*, 737 F. Supp. 1521 (S.D. Cal. 1989), *aff'd* 970 F.2d 552 (9th Cir. 1992).

[95] *Id.* at 559; *see also Republic of Philippines v. Marcos*, 862 F.2d 1355, 1364 (9th Cir. 1988), *cert. denied*, 490 U.S. 1035 (1989)

[96] *See supra* note 87.

inherent equitable power to issue provisional remedies ancillary to their authority to provide final equitable relief.[97]

In determining whether to issue an order restraining a defendant's assets, a plaintiff must show (1) a likelihood of success on the merits; (2) immediate and irreparable harm as a result of defendants' counterfeiting activities; and (3) that defendants might hide their illegal ill-gotten funds if their assets were not frozen.[98]  Plaintiffs have shown all these things, and accordingly, the grant of an injunction restraining the transfer of Defendants' assets is proper.

## IV.   PLAINTIFFS ARE ENTITLED TO EXPEDITED DISCOVERY

District courts have broad power to require early document production and to permit expedited discovery.[99]  Expedited discovery may be granted when the party seeking it demonstrates: (1) irreparable injury; (2) some likelihood of success on the merits; (3) some connection between expedited discovery and the avoidance of irreparable injury; and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that defendant will suffer if expedited discovery is granted.[100]

As demonstrated above, Plaintiffs are being irreparably harmed by the manufacture, importation, offering for sale, distribution, and sale of Counterfeit Products.  While Plaintiffs have learned some aspects of Defendants' counterfeiting activities, Plaintiffs do not yet know with any certainty: the identities of Defendants, the scope of Defendants' activities, the source or location of the Counterfeit Products, or where the proceeds from Defendants' activities have gone.  Plaintiffs, therefore, need to ascertain this information without delay.  Only armed with this information can Plaintiffs seek to amend the Complaint and Temporary Restraining Order and/or Preliminary Injunction to include other individuals and entities involved in this counterfeiting operation and begin to stem the irreparable harm Plaintiffs have and are suffering.

As set forth above, Defendants have gone to great lengths to conceal their true identities and/or move outside of this Court's reach by, among other things, excluding any identifiable information from Defendants' Websites, using phony return addresses on packages of Counterfeit

---

[97] *Levi Strauss & Co.*, 51 F.3d at 986-987; *Reebok v. Marnatech*, 970 F.2d at 558-61.
[98] *Reebok v. Marnatech*, 737 F. Supp. at 1524, 1527
[99] *See* Fed. R. Civ. P. 30(b), 34(b).
[100] *See, e.g., Advanced Portfolio Technologies, Inc. v. Advanced Portfolio Technologies Ltd.*, No. 94 Civ. 5620, 1994 WL 719696, at *3 (S.D.N.Y. Dec. 28, 1994).

Products they send to the U.S. and using false and incomplete information in their registrations for the Infringing Domain Names.  Similarly, Defendants are concealing their profits from the sale of Counterfeit Products, and possibly evading anti-money laundering regulations,[101] by setting up an intricate web of financial accounts that appear from the outside to be separate and unrelated.  While some of Defendants' accounts are with PayPal and Western Union, many are with less-established, off-shore third-party processors like IPS (International Payment Solutions), ECPSS credit card and Alyarica Ltd. Credit Card Payment.[102]  Defendants are using these third-party processors to help increase their anonymity, since there is a third party interposed between the consumer and Defendants.[103]  When Defendants use third-party payment processors, the consumer's credit card statement reflects only the name of the processor (e.g. ECPSS) rather the actual name of Defendants' business selling the goods.[104]  In addition, these third-party payment processors each have one or more "acquiring bank" where consumers' payments for Defendants' Counterfeit Products are kept for a certain period of time before they are released to Defendants.[105]  These third-party payment processors and acquiring banks, in turn, have their own relationships with credit card associations (e.g., MasterCard and VISA) to process and approve consumers' credit card transactions and manage the transfer of funds from consumers to Defendants, via the third party payment providers and acquiring banks.[106]

Without being able to unravel these complicated payment systems, any seizure order and asset restraint would be of limited value because Plaintiffs would not know the entities upon whom to serve the order.[107]  Plaintiffs respectfully request an *ex parte* Order allowing expedited discovery prior to Plaintiffs' execution of the seizure Order and asset restraint.  The discovery requested on an expedited basis in Plaintiffs' Proposed Temporary Restraining Order has been precisely defined and carefully limited to include only what is essential to prevent further irreparable harm.  Discovery of these financial accounts in addition to Defendants' identities and information related to Defendants' Websites and other operations will permit Plaintiffs to gain a full and accurate picture of Defendants' counterfeiting activities and ensure that these activities will be contained.  The

---

[101] Rainey Decl. ¶ 10.
[102] Hewlett Decl. ¶ 13.
[103] Rainey Decl. ¶ 5-6.
[104] Hewlett Decl. ¶ 13; Rainey Decl. ¶ 7.
[105] Rainey Decl. ¶ 8.
[106] *Id.* ¶ 8-10.
[107] *Id.* ¶ 10.

proposed order for expedited discovery includes a protective order regarding any documents turned over to Plaintiffs protecting Defendants from improper disclosure thereof pending a further hearing by this Court.

Plaintiffs are unaware of any reason that Defendants or third parties cannot comply with these expedited discovery requests without undue burden. More importantly, Defendants have engaged in so many deceptive practices in hiding their identities and accounts that Plaintiffs' seizure Order and asset restraint may have little meaningful effect without the requested relief.[108] Accordingly, the request for expedited discovery should be granted.

## V.      SERVICE OF PROCESS BY EMAIL IS WARRANTED IN THIS CASE

Finally, Plaintiffs request the Court's permission to serve Defendants by electronic mail. Defendants are intentionally using the Internet in an attempt to operate outside the reach of the United States courts, in order to avoid detection and prevent service, while conducting a hugely profitable counterfeiting business with consumers in the United States. Given that Defendants are willfully concealing their true identities, it would be virtually impossible to serve Defendants with process without permission to serve by electronic mail.

The goal of Fed. R. Civ. P. 4 is to provide more flexibility in the procedures for giving defendants notice of commencement of an action and to eliminate unnecessary technicalities in the service of process.[109] Due Process requires that any service of notice be "reasonably calculated, under all circumstances, to appraise interested parties of the pendency of the action and afford them an opportunity to present their objections."[110] Since the adoption of Fed. R. Civ. P. 4, this Court has often allowed service of process by email as appropriate under Rule 4, including in situations identical to this one where defendants conducted business through websites, corresponded with customers via email, and did not disclose their physical addresses.[111]

---

[108] Kaplan Decl. ¶ 15-16.

[109] 4 C. Wright & A. Miller, *Federal Practice and Procedure* § 1061, at 216 (2d ed. 1987).

[110] *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

[111] *See e. g. Philip Morris USA Inc. v. Veles Ltd.*, Not Reported in F. Supp. 2d, 2007 WL 725412 (S.D.N.Y. Mar. 12, 2007); *Tishman v. The Associated Press*, 2006 WL 288369 (S.D.N.Y. Feb. 6, 2006); *Bank of Credit & Commerce Int'l (Overseas) Ltd. v. Tamraz*, No. 97 Civ. 4759 (SHS), 2006 WL 1643202 (S.D.N.Y. June 13, 2006); *D.R.I., Inc. v. Dennis*, No. 03 civ. 10026 (PKL), 2004 WL 1237511 (S.D.N.Y. June 3, 2004); *Export-Import Bank of U.S. v. Pulp & Paper Co.*, No. 03 Civ. 8554(LTS)(JCF), 2005 U.S. Dist. Lexis 8902 (S.D.N.Y. May 11, 2005); *Ryan v. Brunswick Corp.*, 2002 WL 1628933 (W.D.N.Y. May 31, 2002).

Plaintiffs' investigators have already communicated with Defendants through various email addresses and therefore have reason to believe that Defendants regularly check these email addresses.[112]  Plaintiffs' investigators have communicated with and/or received emails from Defendants, at twenty-seven (30) different email addresses.[113]  Plaintiffs have every reason to believe that these email addresses are correct and that they are regularly monitored.  Plaintiffs propose to send service via email to all 30 email addresses through which their investigators have been in contact with Defendants.  Defendants will therefore have actual notice of the Summons and Complaint, as well as this Court's Orders and supporting documents.

In an abundance of caution, Plaintiffs propose to use an online service, RPost (www.rpost.com), which provides valid proof of authorship, content (e-mail body and attachments), delivery and official time sent and received.[114]  Thus, Plaintiffs will be able to provide digital confirmation of delivery when Defendants receive email service.

Service by email thus serves the interests of justice, not to mention the principles of fairness. Accordingly, the Court should grant Plaintiffs leave to serve Defendants with the Summons and Complaint, along with the other papers filed by this Action via Defendants' 30 established email addresses.

## CONCLUSION

The size and scope of Defendants' counterfeiting operations are irreparably harming Plaintiffs' businesses and brands.  Without entry of the requested relief, Defendants' sale of the Counterfeit Products will continue to lead prospective purchasers and others to believe Defendants' Counterfeit Products have been manufactured by Plaintiffs, when in fact, they have not.  Defendants are banking on the fact that brand owners like The North Face and Polo Ralph Lauren will, at most, challenge one or two of the vast number of Defendants' Websites under their control, allowing them to switch sites and continue with business as usual.  The only chance to Plaintiffs have to curtail Defendants' counterfeiting ring is by a comprehensive injunction allowing for restraint of all these websites and their domain names, expedited discovery and the restraint of any assets of Defendants that Plaintiffs are able to locate.

---

[112] Hewlett Decl. ¶ 17.
[113] *Id.*
[114] Kertzer Decl. ¶ 6.

Based upon the foregoing, Plaintiffs respectfully request that this Court grant an Order temporarily restraining Defendants from selling their Counterfeit Products or otherwise infringing on Plaintiffs' Marks, an Order transferring the Infringing Domain Names, an Order of seizure, an Order restraining assets, an Order for expedited discovery, and an Order to show cause for preliminary injunction.

Dated: March 1, 2010

Respectfully submitted,

GREENBERG TRAURIG, LLP

By: _____

G. Roxanne Elings (elings@gtlaw.com)
Scott Gelin (gelins@gtlaw.com)
Seth E. Kertzer (kertzers@gtlaw.com)
MetLife Building
200 Park Avenue
New York, NY 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400

*Attorneys for The North Face Apparel
Corp. and PRL USA Holdings, Inc.*